# ATTACHMENT

# SETTLEMENT AGEEMENT

# With Attached Exhibits A and B

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by Plaintiffs the Native American Church of North America ("NACNA") and Sandor Iron Rope ("Iron Rope") and Defendant Transportation Security Administration ("TSA"), a component agency of the Department of Homeland Security, which is an Executive Branch department of the government of the United States of America (collectively the "Parties," singularly a "Party").

## RECITALS

WHEREAS, on or about February 14, 2017, NACNA and Iron Rope commenced an action in the U.S. District Court for the Western District of Texas, Case No. 5:17-cv-108 (the "Lawsuit"), alleging that TSA and its agents violated the Religious Freedom Restoration Act and the U.S. Constitution;

WHEREAS, being mindful of the risks and hazards of litigation and the costs incident thereto, the Parties desire to fully and finally resolve all claims, known or unknown, arising directly or indirectly from the acts or omissions of any current or former federal officer, employee, servant, or agent that gave rise to the Lawsuit. This Settlement Agreement is not, is in no way intended to be, and should not be construed as, an admission of liability or fault on the part of the United States, its agencies, its current or former officers, agents, servants, or employees, including the individual Defendants in the Lawsuit, who specifically deny any wrongdoing or liability.

NOW THEREFORE, in consideration of the promises made hereunder and for other good and valuable consideration, the sufficiency of which is acknowledged, and intending to be legally bound, the Parties agree as follows:

## AGREEMENT

### TSA Actions

1. Within thirty (30) days of filing of the stipulation of dismissal with prejudice of the Lawsuit, TSA will invite NACNA or its designee or legal representative in writing to join TSA's Multicultural Branch Coalition and participate in the Coalition's annual conference. If NACNA elects to join the Multicultural Branch Coalition, TSA shall thereafter invite NACNA to participate in all future telephone conferences, meetings, conferences, and other events open to Coalition constituents.

2. Within thirty (30) days of filing of the stipulation of dismissal with prejudice of the Lawsuit, TSA will contact Plaintiffs to invite them to collaborate on producing an educational webinar. TSA will invite NACNA and Iron Rope (or their designees) to come at their own expense to TSA headquarters and utilize its television studio facilities to produce the webinar. If Plaintiffs prefer not to travel to TSA headquarters, TSA will offer technical advice at its own expense regarding how to use webcams to produce the webinar. Upon completion, a recording of the webinar will be published on both the Multicultural Branch and Passenger Support Specialist ("PSS") Program iShare intranet sites available to TSA employees. TSA will assign the following current employees to either participate live in the webinar or view a recording of the webinar:

   a. PSSs and Transportation Security Managers ("TSMs") at Albuquerque International Sunport ("ABQ") in Albuquerque, New Mexico;

    b.   PSSs and TSMs at Durango-La Plata County Airport ("DRO") in Durango, Colorado;

    c.   PSSs and TSMs at Four Corners Regional Airport ("FMN") in Farmington, New Mexico;

    d.   PSSs and TSMs at Great Falls International Airport ("GTF") in Great Falls, Montana;

    e.   PSSs and TSMs at Laredo International Airport ("LRD") in Laredo, Texas;

    f.   PSSs and TSMs at McAllen Miller International Airport ("MFE") in McAllen, Texas;

    g.   PSSs and TSMs at the Minot International Airport ("MOT") in Minot, North Dakota;

    h.   PSSs and TSMs at Rapid City Regional Airport ("RAP") in Rapid City, South Dakota;

    i.   PSSs and TSMs at Sioux Falls Regional Airport ("FSD") in Sioux Falls, South Dakota; and

    j.   PSSs and TSMs at San Antonio International Airport ("SAT") in San Antonio, Texas.

For four (4) years from the date of filing of the stipulation of dismissal with prejudice of the Lawsuit, TSA will periodically assign newly hired or promoted PSSs and TSMs at the above airports to view the webinar to ensure that PSSs and TSMs are informed about Native American religious items and methods for screening those items.

3.   Within thirty (30) days of filing of the stipulation of dismissal with prejudice of the Lawsuit, TSA will provide NACNA with direct contact information in writing for TSA's Multicultural Branch Tribal Affairs Liaison and the Federal Security Directors and Assistant Federal Security Directors for Screening responsible for the airports listed in Paragraph 2(a) – (j) of this Agreement.  If at least 72 hours advance notice of upcoming travel is provided to these officials in writing and/or to the TSA Cares hotline via telephone or email, TSA will provide the Federal Security Director and/or his or her designee at the airports through which NACNA members will be traveling with a copy of the Job Aid discussed in Paragraph 4 below and request that a PSS or TSM be available at the airports to assist them with the screening process.

4.   Within sixty (60) days of filing of the stipulation of dismissal with prejudice of the Lawsuit, TSA will publish a Job Aid for screening Native American religious items on both the Multicultural Branch and PSS Program iShare intranet sites available to TSA employees, in the form of **Exhibit A** to this Agreement ("Job Aid").  TSA will assign the current employees listed in Paragraph 2(a)-(j) of this Agreement to review the Job Aid.  TSA will also assign the following current employees to review the Job Aid:

    a.   PSSs and TSMs at Denver International Airport ("DEN") in Denver, Colorado;

    b.   PSSs and TSMs at Phoenix Sky Harbor International Airport ("PHX") in Phoenix, Arizona;

    c.   PSSs and TSMs at Minneapolis-Saint Paul International Airport ("MSP") in Saint Paul, Minnesota;

    d.   PSSs and TSMs at Eppley Airfield ("OMA") in Omaha, Nebraska; and

    e.   PSSs and TSMs at Will Rogers World Airport ("OKC") in Oklahoma City, Oklahoma.

For four (4) years from the date of filing of the stipulation of dismissal with prejudice of the Lawsuit, TSA will periodically assign newly hired or promoted PSSs and TSMs at the airports listed in Paragraph 2(a)-(j) and Paragraph 4(a)-(e) to review the Job Aid to ensure that PSSs and TSMs are informed about Native American religious items and methods for screening those items.  When assigning review of the Job Aid to the current employees listed in Paragraph 4(a)-(e), TSA will include with the assignment an invitation to view the webinar described in Paragraph 2.  The invitation will provide a hyperlink to a TSA iShare intranet site at which the webinar will be viewable.

5.   Within ninety (90) days of filing of the stipulation of dismissal with prejudice of the Lawsuit, TSA will publish a "Know Before You Go" fact sheet for travelers with Native American religious items on both the Multicultural Branch and PSS Program iShare intranet sites available to TSA employees, in the form of **Exhibit B** to this Agreement ("Fact Sheet"), and on TSA's public website.  TSA will assign the current employees listed in Paragraph 2(a)-(j) of this Agreement to review the Fact Sheet as part of their required job duties.  For four (4) years from the date of filing of the stipulation of dismissal with prejudice of the Lawsuit, TSA will periodically assign newly hired or promoted PSSs and TSMs at the airports listed in Paragraph 2(a)-(j) to review the Fact Sheet to ensure that PSSs and TSMs are informed about Native American religious items and methods for screening those items.  An electronic copy of the Fact Sheet will be provided to NACNA and Iron Rope for their further sharing with a wider audience of interested members of their communities.

6.   No officer, agent, servant, or employee of the United States is a Party to this Settlement Agreement in his or her personal capacity, and this Settlement Agreement imposes no legal obligations on any past, current, or future officer, agent, servant, or employee of the United States in his or her personal capacity.

7.   Nothing in this Agreement affects the authority or discretion of the United States or its agencies, officers, or employees to engage in any screening, inspection, search, detention, or seizure on any basis whatsoever, and Plaintiffs and their property will continue to be subject to lawful searches, screenings, and inspections.

## Mutual Releases

8.   Plaintiffs and their guardians, heirs, executors, representatives, administrators, and assigns hereby agree and do accept these promises in full settlement, satisfaction, and release of any and all claims, demands, rights, and causes of action of whatsoever kind and nature, including claims for wrongful death, arising directly or indirectly from, and by any reason of any and all known and unknown, foreseen and unforeseen bodily and personal injuries (including emotional injury), damage to property and the consequences thereof which they may have or hereafter acquire against the United States of America, its agencies, current, former, and future officers, agents, servants, and employees, or any of their respective heirs, executors, representatives, administrators, assigns or insurers on account of the events giving rise to the

3

Lawsuit, or that relate to or arise from, directly or indirectly, the events giving rise to the Lawsuit, including any future claim or lawsuit of any kind or type whatsoever, whether known or unknown, and whether for compensatory or exemplary damages or injunctive or other equitable relief. Plaintiffs and their guardians, heirs, executors, representatives, administrators and assigns further agree to reimburse, indemnify, and hold harmless the United States of America, its agencies, current or former officers, agents, servants, and employees from claims made against any of them arising from or relating in any way to any injury to Plaintiffs occurring as a result of the events giving rise to the Lawsuit, including but not limited to actions for contribution, equitable subrogation or indemnification, subrogated or assigned claims, direct or derivative actions, demands, fees, costs, expenses, rights, or liens or claims of any type, including claims for wrongful death. Plaintiffs' release as described above shall include, but is not limited to, all current and former federal defendants, named or unnamed in the Lawsuit.

9. Upon the execution of this Agreement and as consideration for the foregoing, the sufficiency of which is hereby acknowledged, the United States and its agencies, officers, agents, servants, and employees (each only in their official capacities) do hereby release, acquit, forever discharge, and covenant not to sue NACNA and Iron Rope from any and all claims, causes of action, or controversies of any kind whatsoever, whether known or unknown, whether accrued or to accrue, with respect to the Lawsuit from the beginning of time through the Effective Date of this Agreement. The intent of the foregoing release is to fully resolve any and all possible claims that the United States and its agencies, officers, agents, servants, and employees have or may have had against NACNA or Iron Rope related directly or indirectly to the Lawsuit, known or unknown, regardless of their nature, through the Effective Date of this Agreement.

## Dismissal of Lawsuit With Prejudice

10. The Parties agree that on or before January 25, 2018, their attorneys shall execute and file in the Lawsuit a stipulation of dismissal with prejudice of all claims, including those asserted against government officers, agents, servants, and employees in their personal capacities, pursuant to Federal Rule of Civil Procedure 41(a), to which this Settlement Agreement shall be attached as an exhibit.

## Representations and Warranties

11. Each Party warrants that it has unencumbered legal authority to enter into and execute this Agreement, and that the execution and performance of this Agreement has been authorized by all necessary and appropriate organizational action. The Parties and the undersigned individuals signing on behalf of the Parties hereby represent and warrant, as of the date hereof, that they have all the requisite power and authority to enter into this Agreement and perform all of their respective obligations hereunder, and that no claim as to which a release is granted hereunder has been assigned to a third party.

## Continuing Obligations

12. The duties in this Agreement are ongoing. This Agreement binds and inures to the benefit of the Parties hereto, their heirs, administrators, predecessors, successors, assigns, affiliates, officers, directors, members, agents, servants, employees, and attorneys. Duties assumed by TSA shall bind its officers and employees in their official capacities only. The Parties further

agree that all releases provided in this Agreement shall not include the release of any rights or obligations that are created by or that result from this Agreement.

**Miscellaneous**

13. The failure of any Party to exercise any rights under this Agreement shall not be deemed to constitute a waiver of any such rights.

14. This Agreement is the result of negotiations and input by all Parties and their respective attorneys. Therefore, if any dispute arises over the meaning or interpretation of this Agreement, it shall not be construed against a Party on the basis or theory that said Party drafted or was responsible for this Agreement or the language being interpreted in this Agreement because all Parties are taking responsibility for drafting this Agreement.

15. The Parties agree that this Agreement constitutes the entire agreement of the parties with respect to its subject matter, and supersedes any prior negotiations or agreements, whether written or oral, between the parties. The Parties acknowledge and agree that they have not relied on any statement, representation, omission, offer, inducement, or promise of any other Party (or any agent, employee, representative, or attorney for any other Party) in executing this Agreement, except as expressly provided for in this Agreement.

16. The Parties acknowledge that before signing this Agreement they have had the opportunity to have any questions they have regarding the terms or effect of this Agreement answered by attorneys of their choosing. The Parties acknowledge that they have been advised of their rights, remedies, and obligations under this Agreement and the legal consequences of entering into this Agreement and have understood and agreed to same. The Parties have executed this Agreement knowingly and voluntarily and without any coercion, undue influence, threat, or intimidation of any kind whatsoever.

17. It is understood and agreed between and among the Parties that this Agreement is a compromise of disputed claims and that the terms of this Agreement are not to be construed as an admission of liability on the part of any Party hereto.

18. The Parties acknowledge and agree that each Party is responsible for its own attorneys' fees, costs, and expenses with respect to the Lawsuit and this Agreement.

19. This Agreement may not be altered or amended except by any subsequent writing or writings signed by the Parties.

20. This Agreement may be executed in counterparts by the Parties, and a scanned PDF or copy of the signed Agreement shall have the full force and effect of a signed original Agreement. All counterparts and signature pages, together, shall be deemed to be one document.

21. If one or more Sections of this Agreement shall be held invalid, illegal, or unenforceable, the remaining provisions shall not in any way be affected or impaired thereby. In the event any provision is held illegal or unenforceable, the Parties shall use reasonable efforts to substitute a valid, legal, and enforceable provision which, insofar as is practical, implements the purposes of the provision held invalid, illegal, or unenforceable.

22. The date on which the final signature is affixed below shall be the Effective Date of this Agreement.

23. The Parties agree that the Settlement Agreement may be made public in its entirety, and Plaintiffs expressly consent to such release and disclosure pursuant to 5 U.S.C. § 552a(b).

NATIVE AMERICAN CHURCH OF NORTH AMERICA

By _Andrew po_

Its _____President_____

Date: _____1/25/18_____

SANDOR IRON ROPE

_____

Date: _____

JOHN F. BASH
UNITED STATES ATTORNEY
WESTERN DISTRICT OF TEXAS

BY: _James F. Gilligan_
    James F. Gilligan
    Assistant U.S. Attorney
    601 N.W. Loop 410, Suite 600
    San Antonio, TX 78216
    Attorneys for United States of America,
    By and for Transportation Security Administration

Date: _1/24/18_

6

23. The Parties agree that the Settlement Agreement may be made public in its entirety, and Plaintiffs expressly consent to such release and disclosure pursuant to 5 U.S.C. § 552a(b).


NATIVE AMERICAN CHURCH OF NORTH AMERICA

By _____

Its _____

Date: _____


SANDOR IRON ROPE

_____

Date: ___01 / 25 / 18_____


JOHN F. BASH
UNITED STATES ATTORNEY
WESTERN DISTRICT OF TEXAS

BY: _____
    James F. Gilligan
    Assistant U.S. Attorney
    601 N.W. Loop 410, Suite 600
    San Antonio, TX 78216
    Attorneys for United States of America,
    By and for Transportation Security Administration

Date: ___1/24/18_____

6

# EXHIBIT A

 **Transportation Security Administration**

**Multicultural Branch**
Office of Civil Rights & Liberties, Ombudsman and Traveler Engagement

## Job Aid for Screening Native American Religious Items

Followers of Native American religions may travel with items of religious significance.  These items may be delicate or fragile.  The information below may help you screen these items in a respectful and professional manner consistent with the SOP.  **Remember that good communication will help to resolve issues before they begin!**

| Respect & Professionalism | Advisements | SOP-Compliant Strategies | Call for Support |
|---|---|---|---|
| Treat all individuals with respect, dignity, and sensitivity throughout the screening process.  Do not challenge or question the sincerity of a traveler's professed religious beliefs.<br><br>Followers of Native American religions may hold sincere religious beliefs that spiritual energy is kept within certain religious items and carried with the items as they are used from one religious ceremony to the next.  Followers of Native American religions may also believe that physical handling of religious items by people who do not share their religious beliefs pollutes the spiritual energy within the items.  These beliefs should be taken seriously and respected. | Travelers may be unfamiliar with procedures – especially if they don't travel often – so remember to give all advisements, including the options of private screening, asking officers to wear or change gloves, and asking that an officer of a particular gender screen religious items.<br><br>Tell travelers that you will try to facilitate the screening process in a manner that does not require TSA employees to touch religious items.<br><br>Instruct travelers to unpack and separate religious items as much as possible and place them in x-ray bins by themselves with nothing on top of them.<br><br>If you must touch a religious item to perform required screening, ask the traveler to explain how best to hold or place the item. | • Instruct travelers on how to place religious items in x-ray bins in a manner that will help facilitate clear images.<br>• Do not allow other bins to be placed on the x-ray conveyor belt close to bins containing religious items.<br>• If available, offer travelers 3-1-1 clear plastic bags in which to place religious items.  If possible, allow travelers to step out of line and provide them with space in which to unpack and arrange religious items in bins. Travelers may choose to unpack items but are not required to do so.<br>• If x-ray screening results in an alarm, try to resolve it with visual inspection and then ETD screening.  Conduct physical inspection only if there is no other method of resolving the alarm and clearing the item.<br>• Allow a traveler to hold a religious item or place it on a flat surface for visual inspection.<br>• When conducting ETD screening, use gloves and accommodate requests to change gloves. | If you believe that physical inspection of a Native American religious item is required, notify a STSO.  The STSO will determine the appropriate screening procedure.  If a traveler refuses to allow the screening procedure the STSO considers appropriate, do not allow the item into the sterile area.<br><br>If you are unsure if you have discovered an illegal item during screening, follow procedures to contact a law enforcement officer for resolution.  Followers of Native American religions may possess and transport peyote consistent with applicable law; do not contact law enforcement to investigate lawful peyote possession or transportation by followers of Native American religions. |

Questions?  Contact: CRL@tsa.dhs.gov
Multicultural Branch iShare Page – https://team.ishare.tsa.dhs.gov/sites/SC/OCRL/MB/default.asp



**Transportation
Security
Administration**

**Multicultural Branch**
Office of Civil Rights & Liberties, Ombudsman and Traveler Engagement

## Examples of Native American Religious Items

Pictured below: Cedar bag; Sweet grass; Flat Cedar



Pictured below: Peyote - Chief; Fresh, Dry Peyote Buttons



Pictured below: Sage; Peyote rattle; Peyote staff; Eagle bone whistle; Eagle feather fan



Pictured below: Tobacco; Pouch; Corn husk



Pictured below: Water drum; Drum stick; stick bag



Pictured below: Ceremonial tipi



Photos courtesy of the Native American Church of North America

Questions?  Contact: CRL@tsa.dhs.gov
Multicultural Branch iShare Page – https://team.ishare.tsa.dhs.gov/sites/SC/OCRL/MB/default.asp


**Transportation
Security
Administration**

**Multicultural Branch**
Office of Civil Rights & Liberties, Ombudsman and Traveler Engagement

## Understanding the Native American Church

**History of the Native American Church**

The Native American Church is a religion indigenous to North America involving the sacramental use of peyote.  Peyote has been used by the indigenous peoples of North America for over 5,000 years.  The Native American Church was incorporated in 1918 to provide additional legal protection for ceremonial use of peyote by Native American Church members of State/Federally recognized Tribes.

**Native American Church Ceremonies**

Native American Church ceremonies generally take place during the night until morning hours.  The ceremony involves a sacred fire, cedar incense, sacred tobacco, and the consumption of peyote and sometimes peyote tea with ceremonial singing.  A member will prayerfully sing while holding a "peyote staff."  The singer accompanies himself with a gourd rattle and another congregation member plays a water drum.  Congregation members may hold individual feathers or feather fans throughout the night.

**Protections for Native American Church Members**

Native American Church members are permitted by federal law to use, possess, and transport peyote for use in ceremonies. Peyote in the possession of a Native American Church member is not contraband.  If you are unsure if you have discovered an illegal substance during screening, follow procedures to contact a law enforcement officer for resolution.

Native American Church members may also travel with individual feathers and/or feather fans.  Some feathers used are legal regardless of their religious purpose, such as macaw feathers.  Some feathers, such as hawk or eagle feathers, may be covered by international treaties regarding migratory birds and are generally unlawful to possess.  However, the U.S. Fish and Wildlife Service (USFWS) authorizes Native American Church members to possess hawk and eagle feathers obtained through USFWS repositories for religious purposes.

**Native American Church Religious Items**

Native American Church members may be traveling with sacred religious items such as: feathers, feather fans, wooden "feather boxes" or "gourd boxes," drum kettles, drum hides, drumsticks, gourd rattles, tobacco pouches, peyote staffs, peyote jars, and peyote.  As these items are sacred to Native American Church members, they should be treated with respect.  To the extent possible under the SOP, you should not touch these religious items.  Where possible, ask the traveler to hold or display the item for further visual or ETD screening.  If you must touch these items to perform required screening procedures, ask the traveler to explain how best to hold or place the items.  Use professionalism and care when handling religious items and be aware that they may be delicate or fragile.

The information provided here was developed in cooperation with the Native American Church of North America

Questions?  Contact: CRL@tsa.dhs.gov
Multicultural Branch iShare Page – https://team.ishare.tsa.dhs.gov/sites/SC/OCRL/MB/default.asp

# EXHIBIT B



**Transportation Security Administration**

# Know Before You Go

Multicultural Branch, Office of Civil Rights & Liberties, Ombudsman, and Traveler Engagement

## FOR TRAVELERS WITH NATIVE AMERICAN RELIGIOUS ITEMS

**WHAT TO KNOW**

- **TSA Cares:**

  o TSA Cares is a toll-free helpline, 1-855-787-2227 or Federal Relay #711, available for travelers to ask questions about screening or to request help at the checkpoint.  You may call from 8 a.m. to 11 p.m. Eastern time Monday through Friday, and 9 a.m. to 8 p.m. Eastern time weekends and holidays.

  o If you would like assistance at the checkpoint, TSA recommends that you call no less than 72 hours ahead of travel so that TSA Cares has the opportunity to coordinate checkpoint support.  Checkpoint support may include coordination with a Passenger Support Specialist (PSS).  Each airport has different resources; therefore, the level of assistance you receive at the checkpoint can vary.  Some airports have an individual who will call you to gather additional information and arrange a meeting time and place.  Other locations notify the checkpoint manager of your itinerary, but no pre-contact is made.  If you arrive at the checkpoint and have any concerns before, during, or after the screening process, you should immediately request to speak with a Supervisory Transportation Security Officer (STSO) or a PSS for assistance.

  o If you have a religious item that you do not want a TSA Officer to touch because of the tenets of your Native American religious beliefs, you should call TSA Cares before your travel and request that a PSS assist you through the checkpoint. Passenger Support Specialists have received training on special screening considerations and have access to a job aid regarding screening Native American religious items.

  o To the extent possible consistent with required screening procedures, a Passenger Support Specialist will try to facilitate screening of your religious items in a manner that does not require them to be handled by TSA Officers.



- **Communication:**

  - If you have a religious item that you do not want a TSA Officer to touch because of the tenets of your Native American religious beliefs, please clearly and politely communicate that to TSA Officers when you begin the process of divesting your carry-on baggage and personal property into bins for x-ray screening.  Please explain that the item has religious significance and your religious beliefs hold that the item should not be touched by a non-practitioner of your Native American religion.
  - You may ask for an explanation of the screening procedures that will be performed.
  - You may request to speak with a STSO, PSS, or manager.
  - You may request that a STSO, PSS, or manager be present during the screening procedures described below.

- **X-Ray Screening:**

  - Carry-on luggage and all property carried with you at the checkpoint must be screened with x-ray technology.  Bins are provided to hold items undergoing x-ray technology.
  - When divesting your property into x-ray screening bins, you should unpack and separate any religious items as much as possible.  Place religious items in an x-ray bin by themselves with nothing on top of them.  You may request a "3-1-1" clear plastic bag in which to place religious items before putting them in a bin.  If available, a bag will be provided.
  - You may ask TSA Officers for instructions about how best to arrange your religious items in a bin.
  - You may request that a STSO, PSS, or manager be present during the x-ray screening procedure.
  - Do not place other bins on the x-ray conveyor belt close to a bin containing religious items.
  - Unpacking and separating religious items for x-ray screening will help facilitate better x-ray images so that religious items may be cleared without the need for further screening procedures.

- **Visual Inspection:**

  - If x-ray screening of religious items results in an alarm, your carry-on luggage and property may also be subject to visual inspection by TSA Officers.



- o  If x-ray screening of religious items results in an alarm, TSA Officers will attempt to resolve the alarm and clear the items using visual inspection without handling the items.  Placing religious items by themselves in x-ray screening bins will help facilitate effective visual inspection.
- o  At any time, you may request that a STSO, PSS, or manager be present during the visual inspection procedure.
- o  If further visual inspection is required, you may ask to personally hold and display a religious item for TSA Officers or place it on a flat surface for viewing.

- **Explosives Trace Detection (ETD):**

  - o  If an x-ray screening alarm cannot be resolved through visual inspection, ETD screening may be necessary.
  - o  If ETD screening must be performed on your religious items, you may ask TSA Officers to collect a sample without picking up and handling the items.
  - o  If ETD screening must be performed, you may also ask to hold the religious item or lay it on a flat surface while a sample is collected.
  - o  If ETD screening must be performed, you may also ask that the TSA Officer wear gloves or change gloves prior to performing screening.
  - o  At any time, you may request that a STSO, PSS, or manager be present during the ETD screening procedure.
  - o  For ETD testing, the area is swabbed and the swab is tested for the presence of potential explosive residue.
  - o  TSA Officers may also swab a traveler's hands.  Travelers can request a new swab prior to their hands being sampled.
  - o  A TSA Officer of the same gender conducts explosive trace detection, except an ETD of your hands need not be conducted by a TSA Officer of the same gender.  You may request that a male TSA Officer perform the ETD screening of religious items.

- **Physical Inspection:**

  - o  If other screening methods are insufficient to clear an item, physical inspection may be necessary.
  - o  If you have utilized the TSA Cares process and/or communicated that you do not want your religious items to be handled, TSA Officers will, to the extent possible under standard operating procedures, only conduct physical inspection of those items if other methods of screening are insufficient.
  - o  At any time, you may request that a STSO, PSS, or manager be present during a physical inspection.



- o If further physical inspection of a religious item is necessary, you may request that a TSA Officer put on gloves or change into new gloves before touching the item.
- o If additional physical screening of a religious item is required, you may explain to TSA Officers how best to hold or place the religious item.
- o You may request that a male TSA Officer perform the physical inspection of religious items.

- **Private Screening:**

  - o You can request private screening at any time and be accompanied by a companion of your choosing. A second TSA Officer of the same gender will always be present during private screening.

## WHAT TO REMEMBER

- **Contact TSA Cares:** If you are traveling with special religious items, it is recommended that you call TSA Cares in advance of your travel.

- **Packing:** Pack religious items in a container that can be separated from other belongings and placed by itself in a bin for x-ray screening. Do not use a metal container. Try to use a container that can be easily opened so that you can remove religious items and spread them out in separate bins for x-ray screening. It is best to pack religious items in a clear plastic bag or other clear plastic container.

- **Divesting for X-ray Screening:** Unpack and separate religious items as much as possible. Try to place them in an x-ray screening bin by themselves with nothing on top of them. You may request a "3-1-1" clear plastic bag in which to place religious items before putting them in a bin. You may also ask for help arranging your religious items in bins.

- **Arrive Early:** Get to the airport well in advance of your scheduled flight to leave plenty of time to meet a Passenger Support Specialist and organize your religious items for screening.

- **Physical Inspection May Be Required:** TSA will try to facilitate your security screening in a manner that does not require TSA Officers to handle religious items. Contacting TSA Cares in advance of your travel is the best way to help TSA facilitate



your screening in this manner.  TSA may have to physically inspect a religious item if it cannot be adequately screened using x-ray, visual inspection, ETD, or other screening procedures.  Physical inspection may involve a TSA Officer touching the religious item.  If you have an item that you absolutely do not want a TSA Officer to touch under any circumstances, you should not carry that item with you to an airport security screening checkpoint.  You may wish to consider alternative methods of getting the item to your destination.

- **Checked Baggage Is Also Subject to Physical Inspection:**  TSA does not recommend placing important religious items in your checked baggage.  The majority of checked baggage is screened without the need for a physical bag search, but TSA may inspect your checked baggage during the screening process.  If your property is physically inspected, TSA will place a notice of baggage inspection inside your bag.  This is to inform you that an officer conducted an inspection of your property

